## JUDICIAL ARBITRATION AND MEDIATION SERVICES (JAMS)
### REFERENCE NO. 5340001830

**BAILEY BROWN**                                                    **CLAIMANT**

**vs.**

**BIG M CHEVROLET, LLC,**
**MICHAEL COFFMAN, individually.**
**JUSTIN COLLINS, individually,**
**TREY RUSSELL, individually,**
**GAVIN BAXLEY, individually,**
**JESSICA DUNN, individually,**                                    **RESPONDENTS**

### April 30, 2004 Transaction

### PARTIES

1. Claimant, Bailey Kay Brown [hereinafter "Claimant"], is a resident of Hardin County, Ky and is an individual consumer who resides in the Commonwealth and a "buyer" as referenced herein, a "consumer"as defined in TILA, 15 U.S.C. §1602(i), a "person" as defined in both the Ky Motor Vehicle Sales Act, KRS 190.010(2) and in the Ky Consumer Protection Act, KRS §367.110(1), and a "retail buyer" as defined in the Ky Installment Sales Act, KRS §371.210(4).

2. Respondent, Big M On Dixie LLC dba as Big M Chevrolet **[hereinafter referred to as "Big M"** or **Respondent]** is a domestic corporation residing in Hardin County, Commonwealth of Kentucky and a creditor as defined in TILA, 15 U.S.C. §1602(g), a "motor vehicle dealer" as the term is defined in the Ky Motor Vehicle Sales Act, KRS §190.010(2), a "retail seller" as the term is defined in the Ky Installment Sales Act, KRS §371.210(5) engaged in the business of selling, offering to sell, soliciting, or advertising the same, of new or used vehicles, or possessing motor vehicle for purposes of resale, either on its own account, or on behalf of another, either as its primary business

or incidental thereto, doing business in Radcliffe, Ky. and a "person" as the term is defined in the Ky Consumer Protection Act (KCPA) at KRS §367.110 who, in the ordinary course of its business, directly financed the sale and purchase of certain motor vehicles pursuant to certain retail installment sales contracts.

## CLAIM ONE-FEDERAL TRUTH IN LENDING ACT
## JURISDICTION

3. This claim is made pursuant to the Federal Truth-in-Lending Act, 15 U.S.C. 1601, et seq. (hereinafter referred to as the "Act" or "TILA") and CFR 1026.1, et seq. (Reg. Z)

4. The jurisdiction of this Court is invoked pursuant to 15 U.S.C. §1640(e) and 28 U.S.C. §1337.

## GENERAL ALLEGATIONS

5. This is an action for statutory and actual damages which involves a single transaction consummated on April 30, 2024, and no other, brought pursuant to the federal Truth in Lending Act, 15 U.S.C. §1601, et seq. [hereinafter the "Act"] and 12 C.F.R. 1026.1, et seq. [hereinafter Reg. Z]. TILA and Reg. Z provide in pertinent part that their purpose is to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him/her and to avoid the uninformed use of credit. The Respondent is the one and only creditor in Claimant's retail installment sales transaction [hereinafter the "RISC"], i.e, a credit sale. The Claimant's contracts was consummated at the time the buyer signed the RISC presented to her by Respondent and Respondent delivered to her the purchased motor vehicle. Claimant is a  consumer and, at all times referenced herein, the Respondent was a Limited Liability Company licensed to do business in the Commonwealth. Respondent is

a motor vehicle dealer as defined under Ky law, which was engaged in trade or commerce with motor vehicles, and was licensed as a motor vehicle dealer under Ky law.

6. Claimant further alleges that when presented to her by Respondent the RISC terms were entirely illusory because, when signed the RISC agreeing with the terms, Respondent considered each and every provision in the RISC to be non-final and subject to change at Respondent's whim, to wit: Respondent denies that it's the installment creditor, claiming that the "creditor" is some as-yet unknown third party to whom Respondent may choose to assign the RISC.  Respondent contends that some time after Claimant signed the RISC and took delivery of the purchased motor vehicle, if Respondent chooses to sell its obligation to a third party (as opposed to cancelling and changing the terms)  it is at the time of assignment that "consummation" takes place. As a consequence of this procedure Respondent itself is never bound to TILA's mandates and is never obligated under any RISC.  If Respondent chooses not to sell the RISC to a third party it will either unilaterally cancel the RISC and retake possession of the sold vehicle, or will change the terms of the RISC and require the buyer to sign a second, unbargained-for RISC or lose their purchased vehicle.

7. Respondent's acts and omissions are violations of TILA as TILA's purpose is to assure a meaningful disclosures of credit terms so that consumers will be able to compare more readily the various credit terms available to him or her and avoid the uninformed use of credit.

8. In practice the Respondent purportedly conditions the Claimant's RISCs on it's ability to sell its contractual obligation to a third party, thus defining consummation as that point in time when a third party buys Respondent's RISC, sometimes days or weeks after the buyer signs a RISC and accepts delivery of the

purchased motor vehicle.  TILA mandates that consummation occurs at the time that buyers sign the RISC.

9.  The harm that is or may be visited upon the Claimant and others is what happened to the Claimants  That is, Respondent's scheme is to deliver a new or used car to each retail buyer the same day the buyer sets foot on Respondent's lot in order to take them out of the car-buying market.  During the transaction Respondent's words and deeds are designed to convince buyers that they are purchasing and financing a motor vehicle at specific price and specific financial terms which, when Respondent obtains the buyers' signatures on the retail installment contract, represents to the buyers that the financial terms are accepted, are final, and cannot be changed unilaterally.  But by Respondent obtaining Claimant's and others signatures its document the Respondent is surreptitiously and illegally reserving to itself the unilateral and arbitrary ability to change the terms of the contract or to revoke the contract and reacquire the motor vehicle.  Later, when Claimant refuses to acquiesce to different and unbargained-for terms, or if Respondent chooses to revoke the contract, Respondent will retake possession of the motor vehicle and leave the buyer without transportation while retaining the buyer's down payment and/or trade-in.

## SPECIFIC FACTUAL ALLEGATIONS

10. In Mid April, 2024 Claimant began experiencing mechanical issues with her 2014 Audi Q5. As a mother with small children her job as a traveling nurse depended on her having reliable transportation to get from one client to the other. Therefore, Claimant decided that it was time to purchase a different vehicle.

11. Claimant's fiancé, had friends that worked at the Respondent and he suggested that Plain4tiff speak to it about buying a vehicle. Claimant, thereafter, visited Respondent's website to see what kinds of SUV's they had available.

12. On April 30, 2024 Claimant viewed a used GMC Terain on Respondent's website which interested her so she called the dealership and spoke with salesman Gavin Baxley [hereinafter "Baxley']. Baxley advised her to come by that day to take a look at the vehicle which she did.

13. Claimant drove to the Respondent in her 2014 Audi [hereinafter the "trade"] which she anticipated that she might trade in connection with any purchase she might make. When Claimant arrived at the Respondent she met with Baxley. She informed Baxley of her interest in the GMC Terrain she saw on Respondent's website. However, Baxley suggested that she look, instead, at a new 2024 Equinox. Baxley had the vehicle brought around where Claimant immediately took it for a test drive. After doing so, Claimant loved the vehicle because it appeared to be ideal for her job and sufficiently roomy for the transportation of her children.

14. Claimant expressed interest in purchasing the vehicle and immediately thereafter she was asked to fill out a credit application and her vehicle was appraised for trade-in value. After about one hour Claimant was informed that she was approved for credit through GM Financial based on a sales price of $35,000 where she would receive approximately $6220 for her trade and an additional $2000 for being a "healthcare worker" leaving an amount financed of $26,900 before taxes.

15. To those terms Respondent added approximately $3000 in adds ons, assessed Claimant a $400 doc. fee and with $1448 in sales taxes the amount financed would come

out to  be $ 31,812. On that amount financed Respondent disclosed an APR 17.030% which over 84 months resulted in monthly payments of $655.25 with a total of payments of $55,038.

16. The Claimant having agreed to all terms was then introduced to Jessica Dunn, Respondent's F&I person, with whom she sat down with and executed all the appropriate paperwork and documentation which consisted of both a Buyer's Order and Retail Installment Sales Contract providing TILA disclosures and other documents. After which Claimant was congratulated and drove the car home. At no time during this visit was Claimant told that the financing was pending approval or conditional. With everyone's reassurance, Claimant left the dealership fully confident that the sale was concluded and she was the owner of a brand new SUV. Claimant was so certain of this that, on May 9, 2024, she spent $795 to have her windows tinted.

17. On May 20, 2024 Claimant received a call from Baxley who informed her that GM Financial  needed some additional documentation but assured her that everything was fine and there was nothing to be concerned about which Claimant provided on May 23, 2024.

18. However, On May 25, 2024, Claimant received a voicemail from Baxley which, because she was working at the time, was unable to return until the 27th at which time Baxley informed the Claimant that GM Financial had declined to finance  her vehicle demanded its return. This came as a shock and disappointment to Claimant which she questioned Baxley about after he informed her that she had been approved. Baxley responded that GM Financial could not get her approved on that particular vehicle, but if she would bring the vehicle back that day, he could get her approved on an identical 2024 Equinox, like the one she had.

19. On May 28, 2024 Claimant reluctantly returned the vehicle and handed the keys to Baxley. When she asked about the "other" Equinox, Baxley informed her that it was no longer available and suggested that she look at a 2014 Equinox and a 2012 Jeep, both of which had over 100,000 miles on them. Claimant refused to look at either one and asked for the return of her 2014 Audi which she had given in trade. Baxley went to his sales manager and returned shortly to inform her that her trade was no longer on the property, apparently, having already been sold.

## LEGAL ALLEGATIONS

20. Claimant seeks damages under federal Truth-in-Lending Act, 15 U.S.C. §1601, et seq. ("TILA") (hereinafter the "Act") and under Regulation Z, 12 cfr 1026.1, et seq., which are regulations promulgated pursuant to the Act.

21. Claimant hereby incorporates each and every allegation previously alleged in paragraphs 1-19 as if fully rewritten herein.

22. Claimant is "consumer" as the term is defined in the Act at 15 U.S.C. §1602(i).

23. Respondent is a "creditor", who, in the ordinary course of its business operations, regularly extends and/or arranges for the extension of credit to consumers such as the Claimant and as defined in the Act at 15 U.S.C. §1602(g).

24. On April 30, 2024, in connection with a credit sale, Respondent extended credit to the Claimant in the form of a "credit sale" as defined in the Act at 15 U.S.C. §1602(h) resulting in the execution between the parties of a retail installment sales contract supposedly disclosing various credit terms required under the Act.

25. However, Respondent violated TILA and Regulation Z  by using these illusory TILA disclosures in its RISC including the APR, the Finance Charge, the Amount Financed, the Total of Payments, the Total Sale Price and every other material credit term and the putative classes' RISCs because, at the time of consummation as defined by TILA, the disclosures were subject to subsequent change or cancellation at Respondent's sole and arbitrary discretion.

26. Respondent's acts and omissions are violations of TILA and Reg. Z as TILA's purpose is to assure a meaningful disclosures of all material terms so that consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit. This is the case because it is impossible to meaningfully compare terms that are cancellable or changeable at Respondent's whim with credit terms proposed by its competitors.

## CLAIM TWO
## [VIOLATION OF CONSUMER PROTECTION ACT, KRS 367.110]

### LEGAL ALLEGATIONS

27. This claim relates solely to the April 30, 2024 transaction between the parties and no other.

28. Claimant hereby incorporates each and every allegation of paragraphs 1-19 as if fully rewritten herein.

29. On April 30, 2024 Respondent entered into retail installment sales contract for the purchase and financing of a 2024 Chevrolet Equinox [hereinafter the "vehicle"].

30. In connection with the transaction Respondent falsely informed Claimant that GM Financial had approved her for financing and, relying on this, Claimant agreed to take possession of the vehicle and to become obligated under the terms of a retail installments sales contract.

31. Approximately one month later Respondent contacted the Claimant and informed her that it had been unable to obtain financing for vehicle and demanded its return.

32. In order persuade Claimant to return the vehicle Respondent lied and told her that it had an identical vehicle it could "get her approved for."

33. Relying on this, Claimant agreed to return the vehicle and surrendered its keys.

34. When Claimant asked about the "other" Equinox that Respondent had mentioned, she was informed that it was no longer available. Instead she was referred to older model vehicles with high mileage about which she was not interested.

35. Respondent violated the provisions of Kentucky's Consumer Protection Act through its use of numerous unfair, false, misleading statements and/or deceptive acts or practices in the conduct of this April 30, 2024 transaction.

36. As herein alleged, Respondent acted toward Claimant with oppression, fraud, and/or malice, warranting the imposition of punitive damages against it under the Act.

37. Claimant brings this action pursuant to KRS §367.220 which entitles her to an award of actual damages against Respondent.

38. Claimant brings this action Pursuant to KRS 411.184(2) which entitles her to an award of punitive damages against the Respondent.

## CLAIM THREE-UNLAWFUL REPOSSESSION BY DECEIT

## LEGAL ALLEGATIONS

39. This claim relates solely to the April 30, 2024 transaction between the parties and no other.

40. Claimant hereby incorporates each and every allegation of paragraphs 1-19 as if fully rewritten herein.

41. Claimant is a resident of Elizabethtown, Ky.

42. Respondent, Big M is a corporation duly authorized to conduct business within the Commonwealth of Ky and, at all relevant times, was engaged in the business of selling and financing the sale of new and used motor vehicles within Hardin County.

43.  On April 30, 2024 Respondent sold a 2024 Chevrolet Equinox to Claimant. Respondent then extended credit to Claimant through a retail installment sales contract [RISC] containing all relevant and required credit disclosure and payment terms.

44. On April 30, 2024 Respondent informed Claimant that GM Financial had approved her application for credit and that it was a "done deal" or similar words indicating that there were no conditions on receiving financing. Hearing that Claimant accepted all terms, entered into a retail installment sales contract and drove off with the vehicle. In reality Respondent was the only entity which had extended credit at that time.

45. After almost an entire month during which time Claimant was driving and enjoying her vehicle she received a call from Respondent's Salesman, Baxley, informing her that GM Financial had failed to approve her for credit and demanded that she surrender the vehicle.

46. Suspecting that Claimant might be reluctant to return the vehicle after being informed that her credit had been approved, in order to get her to return the vehicle, Respondent deceitfully lied and informed her that, if she would return her vehicle that same day, Respondent had an identical vehicle in stock for which it could get her approved. Hearing that, Claimant reluctantly drove to the Respondent and surrendered the vehicle.

47. After surrendering her vehicle to Respondent she immediately inquired about the "other" Equinox which Respondent said it had available for her. She was informed by the Respondent that the vehicle was no longer available and, instead, she was directed to look at older used vehicles with high mileage.

48. What Respondent, essentially, accomplished through its scheme was an involuntary repossession of Claimant's vehicle using deceit. Claimant was not and never in default of her obligation and, therefore, the demand for her to return the vehicle constituted unlawful taking no different than if a tow truck pulled up to her vehicle and towed it away.

49. The aforementioned acts were committed by Respondent with malice and ill-will and, therefore, entitle Claimant to punitive damages.

**CLAIM FOUR-CONVERSION**

**<u>JURISDICTION</u>**

**LEGAL ALLEGATIONS**

50. Claimant hereby incorporates each and every allegation previously alleged in paragraphs 1-19 as if fully rewritten herein.

51. This claim relates solely to the April 30, 2024 transaction between the parties and no other.

52. This claim for conversion contains two counts: one relating to the taking of Claimant 's 2024 Equinox and the other to her 2014 Audi Q5 which she traded in connection with her purchase of the Equinox.

**Count One: 2014 Audi Q5**

53. In connection with an April 30, 2024 retail installment sales transaction between the parties, Claimant traded her 2014 Audi Q5 in order acquire a 2024 Chevrolet Equinox.

54. On May 28, 2024 Respondent cancelled the April 30, 2024 transaction and both demanded and took back the Equinox from the Claimant.

55. Claimant thereafter demanded the return of her Audi and was informed that it was not available and/or it was no longer at Respondent's location.

56. Respondent has wrongfully detained and removed Claimant's Audi without her consent thereby depriving Claimant from using it.

57. Respondent, having cancelled Claimant's transaction, was obliged to return the Audi and had no right to detain the property.

58. Claimant was prevented from use of her property only by Respondent's actions in wrongfully detaining her property.

59. The conduct of Respondent as described above constitutes conversion and civil theft.

60. Respondent acted to serve its own interests, knowing that such conduct would wrongfully deprive Claimant of her property.

61. At all times mentioned herein, Respondent acted maliciously, wantonly and with reckless disregard for property the rights of the Claimant.

## Count Two: 2024 Chevrolet Equinox

62. Claimant purchased and financed a 2024 Equinox from the Respondent on April 30, 2024 under the terms of a retail installment sales contract.

63. Claimant was informed by the Respondent that her credit had been approved by GM Financial.

64. The agreed upon terms of the obligation were that Claimant was to finance $31,812.65 for 84 consecutive monthly payments of $655.22.

65. Respondent was the actual creditor who extended the credit but apparently was unable to sell her obligation to a third party or refused to do so.

66. Respondent thereafter told the Claimant that it was unable to obtain financing for the vehicle when, in fact, it was the actual creditor who had actually extended credit to the Claimant.

67. Respondent, without any justification or legal authority, demanded that Claimant surrender the vehicle to it.

68. Claimant was the lawful and titled owner of the vehicle at the time but, based on the false information provided by the Respondent, believed Respondent and surrendered the vehicle to it.

69. Claimant had not defaulted on the terms of the retail installment sales contract.

60.  Respondent has wrongfully detained and removed Claimant's Audi without her consent thereby depriving Claimant from using it.

70. Claimant was prevented from use of her property only by Respondent's actions in wrongfully detaining her property.

71. The conduct of Respondent as described above constitutes conversion and civil theft.

72. Respondent acted to serve its own interests, knowing that such conduct would wrongfully deprive Claimant of her property.

73. At all times mentioned herein, Respondent acted maliciously, wantonly and with reckless disregard for property the rights of the Claimant.

## **Prayer for Relief**

Claimant prays for the following relief:

(a) in claim one for both statutory and actual damages;

(b) in claim two for actual and punitive damages;

(c ) in claim three for compensatory and punitive damages;

(d) in claim four for compensatory and punitive damages;

(e) for reimbursement of attorney fees in connection with the prosecution of these claims;

(f) for reimbursement of all costs and expenses incurred in connection with the prosecution of this matter;

(g) for a trial by Jury; and,

(h) any and all other relief this Court may deem appropriate.


Respectfully submitted by:


/s/ *Gregory I. Thompson*
**Gregory I. Thompson, Esq.**
Thompson & Shreve PLLC
200 South Main Street
Elizabethtown, KY 42701
(270) 737-1125
git@thompsonlaw.org


and

**_/s/Steven C. Shane_**

Steven C. Shane (0041124 Ohio Bar)

Pro Hac Vice Trial Attorney for Claimant

P.O. Box 73067

Bellevue, Ky. 41073

(859) 431-7800

(859) 431-3100 facsimile

shanelaw@fuse.net

## May 28, 2024 Transaction

### **INTRODUCTION**

Comes now, Claimant Bailey Brown ("Claimant"), by and through her undersigned counsel, hereby files this Complaint against Respondents Big M Chevrolet, LLC ("Big M"), Michael Coffman, Justin Collins, Trey Russell, Gavin Baxley, and Jessica Dunn (collectively "Respondents"), and alleges as follows:

PARTIES

1. Claimant Bailey Brown is a consumer and a resident of Hardin County, Kentucky. Claimant, Bailey Kay Brown [hereinafter "Claimant"], is a resident of Hardin County, Ky and is an individual consumer who resides in the Commonwealth and a  buyer  as referenced herein, a  consumer, "as defined in TILA, 15 U.S.C.  1602(i), a  person  as defined in both the Ky Motor Vehicle Sales Act, KRS 190.010(2) and in the Ky Consumer Protection Act, KRS  367.110(1), and a  retail buyer  as defined in the Ky Installment Sales Act, KRS  371.210(4).

2. Respondent Big M Chevrolet, LLC is a Kentucky limited liability company with its principal place of business in Hardin County, Kentucky. 2. Respondent, Big M On Dixie LLC dba as Big M Chevrolet **[hereinafter referred to as "Big M"** or

1

**Respondent**]  is a domestic corporation residing in Hardin County, Commonwealth of Kentucky and a creditor as defined in TILA, 15 U.S.C. 1602(g), a   motor vehicle dealer   as the term is defined in the Ky Motor Vehicle Sales Act, KRS   190.010(2), a retail seller   as the term is defined in the Ky Installment Sales Act, KRS   371.210(5) engaged in the business of selling, offering to sell, soliciting, or advertising the same, of new or used vehicles, or possessing motor vehicle for purposes of resale, either on its own account, or on behalf of another, either as its primary business or incidental thereto, doing business in Radcliffe, Ky. and a   person   as the term is defined in the Ky Consumer Protection Act (KCPA) at KRS   367.110 who, in the ordinary course of its business, directly financed the sale and purchase of certain motor vehicles pursuant to certain retail installment sales contracts [hereinafter referred to as "Respondent" or "Big M"].

3. Respondent Michael Coffman is a chief operating officer of Respondent Big M who dealt unlawfully with the Claimant as described hereinbelow.

4. Respondent Justin Collins is a general manager of Respondent Big M who dealt unlawfully with the Claimant as described hereinbelow.

5. Respondent Trey Russell is a finance manager of the Respondent Big M who at all relevant  times dealt unlawfully with Claimant as described hereinbelow.

6. Respondent Gavin Baxley is employed as a salesperson by Big M who at all relevant times unlawfully with Claimant as described hereinbelow.

7. Respondent, Jessica Dunn, is employed as a finance and insurance person by Big M at all relevant times unlawfully with Claimant as described hereinbelow.

2

## FACTUAL ALLEGATIONS

**8.** On April 19, 2024 Respondent sold Claimant a 2024 Chevrolet Equinox falsely informing her that she had a done deal in which her financing had been approved and delivered the vehicle to her on the spot. More than a month later Respondent contacted the Claimant and informed her that it was unable to obtain financing and demanded the return of the Equinox. In order to lure Claimant to its premises so that it could unlawfully repossess Claimant's Equinox Respondent Baxley falsely assured her that Respondent Big M had an identical vehicle available which could be transferred to her upon her return to the Respondent and her surrendering her vehicle.

9. When Claimant arrived at Big M and surrendered her vehicle, she was informed that the other promised Equinox had been sold and was unavailable. After unlawfully re-taking possession of Claimant's 2024 Chevrolet Equinox on May 28, 2024 and having made her trade unavailable, Claimant was left without a vehicle.

10. Taking further advantage of Claimant's desperate situation Respondents pressured Claimant into purchasing a 2022 Chevrolet Blazer [hereinafter referred to as the "Blazer"].

11. The cash price for the Blazer came to $28,702 with sales tax to which Respondents reapplied Claimant's $6000 trade-in allowance and required a $2000 cash downpayment which she didn't have to pay in the earlier transaction. Further, Claimant was required to sign a new retail installment sales contact since she had to finance the purchase.

12. Once again, Claimant was assured that financing had already been approved through Westlake Financial although she continued to be skeptical considering her previous experience. Claimant asked numerous times throughout the transaction

3

whether financing had been approved and was assured each time "100%" that it was. Having little choice since her trade was gone where she desperately needed a vehicle, she reluctantly agreed to go through with the deal by signing all the paperwork and took possession of the Blazer.

13. Only 3 days later Claimant received a text message from Respondent Dunn informing Claimant that her "HR Department needed to do a customer review." Claimant received similar texts on June 3 and June 4.

14. On June 5, 2024 Claimant received a text message Respondent Russell which stated that she needed to call Westlake Financial and to complete a "customer welcome call so they could verify her employment" with a voicemail later that day with the same request.

15. On June 6, 2024 Claimant received 2 more texts from Respondent Russell. The first stating that Claimant needed to do a customer and HR interview that day "or the bank would return the deal." The second stating that Claimant "needed to bring her car back or complete the welcome call and employment verification by close of business by Friday June 7. Further that if Claimant didn't do one or the other Respondents were going to "report the vehicle as stolen."

16. Claimant had already completed her Welcome call with the Westlake and was surprised to hear Respondent Russell's threats to report her vehicle stolen. At 4:06 on June 6, 2024, Claimant sent Russell a text message letting him know that she had already called Westlake and completed her Welcome call and that Westlake was already verifying her employment. Claimant had already completed all her required tasks and could not understand why Respondents were continuing to contact and threaten her multiple times a day.

17. On June 10, 2024, Claimant was contacted again via text message from Respondent Baxley who was now requesting information about Claimant's "employer verification code". Claimant asked what was meant by "employer

verification code" and Baxley said he needed it for Westlake to verify her employment. Claimant informed Baxley that she had already covered all of this with Westlake during her welcome call and that she was informed that it had all the information it needed and her welcome call was complete. Baxley continued the claim that he needed her employer to verify her employment.

18. On June 11, 2024, Claimant received another message from Baxley requesting her employer code. Claimant referred him to the website that her employer uses to verify employment. Baxley sent her two more text messages that day but Claimant had no other information to give him.

19. On June 13, 2024, a barrage of text messaging began again with Respondent Baxley requesting Claimant employer code and referring to her alleged failure to supply it as "a little ridiculous" and again threatening to report her car stolen if she failed to comply with his requests. Claimant sent a text back requesting a phone number for another dealership employee that she could talk to. She was given the name and number of Respondent Dunn who she called and left a voicemail but did not get a return call that day. Claimant, by this time was getting so fed up and sick and tired that she considered washing her hands of all of this and just returning the Blazer.

20. On June 14, 2024, When Claimant raised the subject of returning the vehicle with Dunn, she was informed that she could bring back the Blazer but, according to Respondent Collins, she would owe Respondents 0.75 per mile for the miles that she put on both the Blazer and her previous vehicle which both totaled $3000. At that time, she recalled having been told by Respondent Baxley before she was required to return her Equinox, that she would not be charged for any mileage. However, since she received only $6000 for her trade, she anticipated receiving only $3000 using Respondents' formula. Nothing was mentioned concerning her $2000 cash down payment. She thereafter asked Respondent Dunn to have

Respondent Collins send her an itemized breakdown of her charges. Later that day Claimant received a text from Respondent Dunn informing her that she spoke with Respondent Russell who informed her that Claimant would also be required to pay for detailing of both vehicles which, to her, meant a further reduction of her refund which caused her to become more upset.

21. On June 28, 2024, Claimant's fiancé received a text message from his friend Jordan Ensign, who was a sales person at Respondents stating Claimant needed to bring her Blazer back by Monday morning (July 1,2024) so they could "go over options" with Claimant.

22. On July 1, 2024, at about 1 pm, Ensign again sent a text to Claimant's fiancé informing him that Claimant "was going to get into trouble because the police were going to issue a warrant for Claimant's arrest." Later that day Claimant received a call from an unrecognized number. The caller turned out to be Lt. Holman of the Radcliff Police who left a message stating that he was investigating the theft of Respondent's Blazer which would be a felony.

23. On July 14, 2024 Claimant's vehicle was repossessed by Gary Watts at the instruction of Respondents. Claimant had no further contact with the Respondents after that date. On August 8, 2024 Claimant called Westlake Financial to get information about why her loan had been denied and, to her surprise, she was informed that the deal had not been denied and that financing was still pending. Westlake was merely waiting to receive further documentation from Respondents.

24. Thereafter Respondents informed Claimant that her traded-in Audi had already been sold and that she would owe Big M money for use of both the Equinox and Blazer.

25. Respondents made a false report to law enforcement accusing Claimant of felony theft, despite knowing that a valid contract existed and that Claimant had fulfilled her obligations under that contract.

26. Respondents' actions have caused Claimant to suffer damages including legal expenses.

27. The Claimant was not in default at any relevant time.

28. Despite the Claimant's compliance with the loan agreement, the Respondent, without proper notice of deficiency, repossessed the Claimant's vehicle on or about July 14, 2024.

## CLAIM ONE- UNLAWFUL REPOSSESSION

**29.** Claimant hereby incorporates each and every allegation previously alleged in paragraphs 1-30 as if fully rewritten herein.

**30.** This claim relates solely to the May 28, 2024 sale and financing of a 2022 Chevrolet Blazer and no other.

31. Claimant Bailey Brown is a victim of unlawful and predatory sales, financing advertising, credit, and repossession practices in connection with her purchase of 2022 Chevrolet Blazer (hereinafter the "Blazer) and its subsequent unlawful repossession in July of 2024.

## LEGAL ALLEGATIONS

**32.** On May 28, 2024 Respondents sold a 2022 Chevrolet Blazer to Claimant.

Claimant was informed that her contract was to be sold or assigned to Westlake Financial.

33. At the time of sale Claimant requested many times and was assured by the Respondents    many times that her financing had been approved. Claimant relied on this representation and accepted possession of the Blazer.

34. On or about July 14, 2024 looked outside her home to find her vehicle being hooked up to a tow truck by Gary Watts at the request of  Respondents and taken away without her consent.

35.  Claimant was the rightful owner of the Blazer and not in default at the time of the repossession.

36. Respondents had no right under the law to take Claimant's vehicle. Respondents, by their actions, essentially stole Claimant's vehicle.

37. Respondents' actions were willful, wanton and malicious, and were done with evil motive or reckless indifference to the rights of Claimant.

## CLAIM TWO-UNIFORM COMMERCIAL CODE
## LEGAL ALLEGATIONS

38. This claim is made pursuant to the Kentucky Uniform Commercial Code, K.R.S. 355.9-601, et seq. which deals with retaking of collateral and specifically Claimant's Chevrolet Blazer.

39. This claim is brought exclusively against the Respondent, Big M Chevrolet and no other Respondent.

40. Claimant realleges paragraphs 1-42 as if rewritten herein.

41. On May 28, 2024 entered into a sales contract for the purchase of a 2022 Chevrolet Blazer.

42. Respondent extended credit to the Claimant in the form of a retail installment sales contract [hereinafter the RISC].

43. Pursuant to the RISC Respondent retained a security interest.

44. Respondent thereafter falsely declared Claimant to be in default of the RISC.

45. On July 14, 2024 Respondent repossessed the Blazer pursuant to the RISC.

46. Respondent thereafter sold the vehicle without ever notifying Claimant of its sale or opportunity to redeem in violation of K.R.S 355.9-611.

47. Claimant is entitled to the damages set forth in K.R.S. 355.9-625(3)(b).

## CLAIM THREE-THE FEDERAL TRUTH IN LENDING ACT
## LEGAL ALLEGATIONS

48. Claimant seeks damages under federal Truth-in-Lending Act, 15 U.S.C. 1601, et seq. ( TILA ) (hereinafter the  Act ) and under Regulation Z, 12 cfr 1026.1, et seq., which are regulations promulgated pursuant to the Act.

49. This claim is brought exclusively against the Respondent, Big M. Chevrolet and no other Respondent.

50. Claimant hereby incorporates each and every allegation previously alleged in paragraphs 1-52 as if fully rewritten herein.

51. Claimant is a "consumer"  as the term is defined in the Act at 15 U.S.C. 1602(i).

52. Respondent is a  "creditor", who, in the ordinary course of its business operations, regularly extends and/or arranges for the extension of credit to consumers such as the Claimant and as defined in the Act at 15 U.S.C. 1602(g).

53. On May 28, 2024, in connection with a credit sale, Respondent extended credit to the Claimant in the form of a "credit sale" as defined in the Act at 15 U.S.C. 1602(h) resulting in the execution between the parties of a retail installment sales contract  supposedly disclosing various credit terms required under the Act**.**

**54.** However, Respondent violated TILA and Regulation Z  by using illusory TILA disclosures in its RISC including the APR, the Finance Charge, the Amount Financed, the Total of Payments, the Total Sale Price and every other material credit term and RISCs because, at the time of consummation as defined by TILA, the disclosures were subject to subsequent change or cancellation at Respondent's sole and arbitrary discretion.

55. Respondent's acts and omissions are violations of TILA and Reg. Z as TILA's purpose is to assure a meaningful disclosure of all material terms so that consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit. This is the case because it is

impossible to meaningfully compare terms that are cancellable or changeable at Respondent's whim with credit terms proposed by its competitors.

## CLAIM FOUR-THE KENTUCKY CONSUMER PROTECTION ACT
## LEGAL ALLEGATIONS

56. This claim is brought pursuant to Ky's Consumer Protection Act, K.R.S. 367.110, et seq.

57. This claim relates solely to the May 28, 2024 transaction between the parties and no other.

58. Claimant hereby incorporates each and every allegation of paragraphs 1-60 as if fully rewritten herein.

59. On May 28, 2024 Respondents entered into retail installment sales contract for the purchase and financing of a 2022 Chevrolet Blazer [hereinafter the "Blazer"].

60. In connection with the transaction Respondents falsely informed Claimant that Westlake Financial had approved her for financing and, relying on this, Claimant agreed to take possession of the vehicle and to become obligated under the terms of a retail installment sales contract [the "RISC"].

61. Approximately one month later Respondents contacted the Claimant and informed her that they had been unable to obtain financing for vehicle and demanded its return.

62. Respondents violated the provisions of Kentucky's Consumer Protection Act, K.R.S. 367.170  through its use of numerous unfair, false, misleading statements, deceptive and unconscionable acts or practices in the conduct of this May 28, 2024 transaction and beyond.

63. As herein alleged, Respondents acted toward Claimant with oppression, fraud, and/or malice, warranting the imposition of punitive damages against it under the Act.

64. Claimant brings this action pursuant to KRS §367.220 which entitles her to an award of actual damages against Respondents.

65. Claimant brings this action pursuant to KRS 411.184(2) which entitles her to an award of punitive damages against the Respondents.

### CLAIM FIVE -CONVERSION & THEFT

### LEGAL ALLEGATIONS

66. This claim relates solely to the May 28, 2024 transaction between the parties and no other.

67. Claimant hereby incorporates each and every allegation previously alleged in paragraphs

1-69 as if fully rewritten herein.

68. This claim for conversion contains two counts: one relating to the taking of Claimant 's 2022 Blazer and the other to her 2014 Audi Q5 which she traded in connection with her purchase of the Blazer as well as her $2000 cash downpayment.

### Count One: 2014 Audi Q5

69. In connection with a May 28, 2024 sale and retail installment sales transaction between the parties, Claimant traded her 2014 Audi Q5 in order acquire a 2022 Chevrolet Blazer.

70. On July 14, 2024 Respondents unilaterally cancelled the May 28, 2024 transaction and repossessed Claimant's Blazer when she was not in default.

71. Claimant thereafter demanded the return of her Audi and was informed that it was not available and/or it was no longer at Respondent's location.

72. Respondents wrongfully detained and removed Claimant's Audi without her consent thereby depriving Claimant from using it.

73. Respondents, having cancelled Claimant's transaction, was obliged to return the

Audi and had no right to detain the property.

74. Because Respondents wrongfully detained Claimant's property, Claimant was prevented from use of her property.

75. The conduct of Respondents as described above constitutes conversion and civil theft.

76. Respondents have acted to serve their  own interests, knowing that such conduct would

77. wrongfully deprive Claimant of her property.

78. At all times mentioned herein, Respondent acted maliciously, wantonly and with reckless      disregard for property the rights of the Claimant.

### Count Two: Claimant's $2000 Down Payment

**79.** Claimant hereby incorporates each and every allegation previously alleged in paragraphs 1-82 as if fully rewritten herein.

80. Claimant purchased and financed a 2022 Chevrolet Blazer from the Respondents on May 28, 2024 under the terms of a retail installment sales contract.

81. Claimant was informed by the Respondent that her credit had been approved by Westlake Financial.

82. In connection with the transaction, in addition to trading in her Audi vehicle, she gave

a $2000 cash down payment toward the purchase price

83. Respondents thereafter informed Claimant that it was unable to obtain financing for the Blazer and, without any justification or legal authority, repossessed Claimant's Blazer.

84. While Claimant demanded the refund of her down payment Respondents refused to make a refund of any of it.

85. Claimant had not defaulted on the terms of the retail installment sales contract.

86. Respondents have wrongfully detained Claimant's $2000 without her consent and in spite of her demand for it depriving Claimant from having access to it.

87. Claimant was prevented from use of her property only by Respondents' actions in wrongfully detaining her property.

88. The conduct of Respondents as described above constitutes conversion and civil theft.

89. Respondents acted selfishly to serve their own interests, knowing that such conduct would wrongfully deprive Claimant of her property.

90. At all times mentioned herein, Respondents acted maliciously, wantonly and with reckless disregard for property the rights of the Claimant.

## CLAIM SIX-DEFAMATION/SLANDER PER SE
## LEGAL ALLEGATIONS

91. This claim seeks damages on behalf of Claimant against Respondents for Defamation of

Character.

92. Claimant hereby incorporates by references paragraphs 1-94 as if fully incorporated herein.

93. On May 28, 2024 Claimant purchased a 2022 Chevrolet Blazer which is financed and attempted to sell to a third party creditor; namely, Westlake Financial.

94. At the time of this transaction Respondents assured Claimant that financing had been approved several times which allowed her to take possession of the Blazer.

95. Thereafter, at some point in time after the sale, Respondents contacted the Claimant and informed her that her financing had not been approved and demanded that she return the vehicle, and if she didn't Respondents asserted that they would report the Blazer stolen.

96. The assertion that Claimant had stolen the Blazer was initially made public through an employee of Respondents who notified Claimant's fiancé that Claimant had stolen the Blazer and that if she didn't return it, she would be charged with a theft offense.

97. Respondents thereafter falsely reported the vehicle as stolen to the Radcliff, Ky. Police Department where Claimant received a telephone message from one of its police officers asserting that she had committed a felony and that she would be charged as such if she didn't return the Blazer.

98. Respondents expressly referenced Claimant in all their false and defamatory statements.

99. The assertion by Respondents that Claimant had stolen the Blazer were false and untrue.Claimant was demonstrably damaged and injured as the assertion that she was a thief  who had stolen a motor vehicle was per se defamatory.

## CLAIM SEVEN: INFLICTION OF EMOTIONAL DISTRESS
## LEGAL ALLEGATIONS

**100.**    Claimant incorporates by reference all preceding paragraphs.

101.    Respondents' conduct in defrauding Claimant, converting her property, and falsely accusing her of criminal activity was extreme and outrageous.

102.    Respondents intended to cause Claimant severe emotional distress or acted with reckless disregard of the probability of causing such distress.

103.    As a result of Respondents' conduct, Claimant has suffered severe emotional distress.

## CLAIM EIGHT: FALSE REPORTING OF AN INCIDENT
## LEGAL ALLEGATIONS

104.    Claimant incorporates by reference all preceding paragraphs.

105.    Respondents knowingly made false reports to law enforcement accusing Claimant of felony theft.

106.    These false reports were made with the intent to harm Claimant and to cover up Respondents' own wrongful actions.

107.    As a result of Respondents' false reporting, Claimant has suffered damages.

## CLAIM NINE: CIVIL CONSPIRACY
## LEGAL ALLEGATIONS

108.    Claimant incorporates by reference all preceding paragraphs as if fully set forth herein.

109.    Respondents Big M Chevrolet, Collins, Russell, Baxley, and Dunn entered into an agreement or combination, either explicitly or implicitly, to engage in a concerted effort to defame Claimant by falsely accusing her of criminal conduct.

110.    The unlawful objective of this conspiracy was to harm Claimant's reputation through defamatory statements, including the false report to law enforcement alleging felony theft, which Respondents knew to be baseless.

111.    In furtherance of this conspiracy, Respondents committed overt acts, including collaborating to fabricate and publish the false theft allegation to law enforcement;

112.    Respondents' conspiracy to defame Claimant directly caused reputational harm,    emotional distress, and financial damages, as detailed in prior counts.

15

**<u>PRAYER FOR RELIEF</u>**

Claimant prays for the following relief:

a. **For all claims stated herein,** an award of compensatory damages, including but not limited to actual damages for financial loss, emotional distress, and reputational harm, in an amount to be determined at trial;

b. **For all claims arising under contract, statute, or common law,** an award of contract damages, including but not limited to all amounts wrongfully withheld or owed to Claimant under the relevant agreements and statutes;

c. **For all claims where authorized by law,** an award of punitive damages for Respondents' willful, wanton, malicious, oppressive, or fraudulent conduct, in an amount sufficient to punish Respondents and deter similar conduct in the future;

d. **For all claims providing for statutory or special damages,** such damages as are authorized by law, including but not limited to those recoverable under the Kentucky Uniform Commercial Code, the Kentucky Consumer Protection Act, and the Truth in Lending Act;

e. **For attorney's fees and costs** incurred in prosecuting this action, as permitted by statute or contract;

f. **For pre- and post-judgment interest** as allowed by law;

g. **For a trial by jury** on all issues so triable; and

h. **For any and all other relief** to which Claimant may appear entitled or as the Court deems just and proper.

Respectfully submitted by:

/s/ *Gregory I. Thompson*
**Gregory I. Thompson, Esq.**
Thompson & Shreve PLLC
200 South Main Street
Elizabethtown, KY 42701
(270) 737-1125

and


Respectfully submitted by:


**/s/Steven C. Shane**
Steven C. Shane (Ohio Bar #0041124)
Trial Attorney for Plaintiff
P.O. Box 73067
Bellevue, Ky. 41073
(859) 431-7800
(859) 431-3100 direct dial
shanelaw@fuse.net